# Richmond

ARTHUR GONZALES, ET AL. v. ROBERT G. WYATT, ET AL.

January 16, 1961.

Record No. 5170.

Present, Eggleston, C. J., and Buchanan, Whittle and I'Anson, JJ.

The opinion states the case.

*Ralph H. Brumet,* for the appellants.

*George B. Kreger,* for the appellees.

MILLER, J., delivered the opinion of the court.[1]

---

[1] This opinion was prepared by Justice Miller before his death and is adopted as the opinion of the court.

On July 7, 1959, Arthur Gonzales and others filed a petition under the provisions of section 15-267, Code 1950[2], in the clerk's office of the circuit court of Washington county. This petition contained 1,134 signatures and stated that the undersigned were "duly qualified voters" of Washington county, Virginia, and asked that a referendum be held on the question of adopting the county executive form of government as provided for under Title 15, chapter 11, articles 1, 3 and 4, Code 1950. On July 9, 1959, counsel presented the petition to the court and by order of that date two members of the local bar were appointed special commissioners to ascertain and report to the court within forty days the number of qualified voters of Washington county who signed the petition and whether the same constituted at least ten per cent of the qualified voters in the county.

On nine different days between August 1, 1959, and September 5, 1959, both inclusive, a total of 119 persons, including Robert G. Wyatt and the other appellees, filed petitions under oath with the court asking that their names be withdrawn and stricken from the original petition. The reasons assigned by them for asking withdrawal of their signatures were that the details of the proposed change in the form of government were not explained to them and that they did not understand the proposed changes when they signed the original petition but had since learned more about the changes sought and would not have signed the petition had they understood its full import.

The court by order of August 7, 1959, extended the time for filing the special commissioners' report to September 4, 1959. On that date the commissioners, after carefully verifying all signatures on the petition and ascertaining the signers' qualifications as voters, filed their report stating that "to the best of their information and belief" there were 8,182 qualified registered voters in the county, ten per cent of which would be 818, and that "to the best of their informa-

---

[2] The pertinent parts of that section follow: "Upon a petition filed with the circuit court of the county, or the judge thereof in vacation, signed by ten per cent of the qualified voters of such county which in no event shall be less than one hundred qualified voters of the county, asking that a referendum be held on the question of adopting one of the forms of county organization and government herein provided for, the court or the judge thereof in vacation shall, by order entered of record, require the regular election officials at the next regular election or on the day fixed in such order to open a poll and take the sense of the qualified voters of the county on the question submitted as herein provided. If a special election is called it shall be held not more than ninety days nor less than sixty days from the filing of the petition, but not within thirty days of any general election. * * *"

tion and belief" there were 895 qualified and registered voters' signatures on the petition. They were unable to verify 70 signatures. In an order of September 5, 1959, the court stated that the report had been filed and that no exceptions had been taken thereto. That order also recited that the attorney for those who sought withdrawal of their names from the initial petition had moved the court to that effect and that the attorney for Arthur Gonzales and others thereupon moved that if the court permitted withdrawal of names from the petition, then he be permitted to "add certain other names to the petition." No ruling was then made upon these motions but by agreement of counsel it was ordered that the commissioners examine the lists of those who sought to withdraw their names and report the number of qualified voters who sought to do so. On September 12, 1959, the commissioners reported that of the 119 who sought to withdraw from the original petition, 107 were qualified voters and that they had been counted in the 895 qualified voters who signed the petition. That left 788 qualified voters on the petition or 30 less than the required ten per cent of 8,182.

With their report the commissioners filed a statement of their work which showed that they had devoted 444.96 hours to their duties and traveled 513 miles. They asked for a fee of $3,337.20 and reimbursement of expenses of $80.99, a total of $3,418.19.

The record also discloses that on September 18 and 21, eight additional signers of the original petition filed written requests to withdraw their signatures.

On September 21, 1959, the court heard argument from counsel for Arthur Gonzales and other qualified signers who desired the referendum and from counsel for Robert G. Wyatt and others who sought to withdraw from the petition upon the questions of (a) whether or not the petitioners who sought to withdraw their names should be allowed to do so, and (b) who should be required to pay the taxable court costs of the proceeding, including the compensation of the special commissioners, in event no referendum was ordered.

In a written opinion filed on October 7, 1959, the court held that the 107 qualified voters who filed petitions under oath for leave to withdraw from the initial petition would be permitted to do so. When these 107 signatures were withdrawn, the number remaining was less than ten per cent of the qualified registered voters in the county. The court concluded that $1,500 should be paid the commissioners for their services and also allowed the expenses of $80.99, a total of $1,580.99.

In the final order of October 15, 1959, Robert G. Wyatt and the other 106 petitioners were allowed to withdraw their names from the petition, and $1,580.99 was ordered to be paid to the special commissioners "by all of those 895 persons whose names appear on the petition filed herein on July 7, 1959, jointly and severally." The order then recites that counsel for Arthur Gonzales and others moved the court for leave to file the signatures of additional qualified voters who desired to petition for the referendum; to allow persons who had asked to withdraw their names but who now desired to have them reinstated to the original petition, to do so, and to allow the introduction of further evidence to identify and verify the 70 names on the original petition which the commissioners had been unable to verify and to consider these additional names for the purpose of meeting the statutory requirement of ten per cent of the qualified voters. The motions were denied, and the original petition was dismissed.

We granted an appeal to Arthur Gonzales and others.

The dominant questions presented here, as in the trial court, are whether or not the 107 signers of the original petition should have been allowed to withdraw their names and against whom should the costs of the litigation, including the special commissioners' fees, be charged.

It is insisted by appellants that after the petition was filed and the court had by order of July 9, 1959, appointed the commissioners, none of the signers could withdraw. However, the 107 appellees who were allowed to withdraw their names from the petition earnestly contend that the court committed no error by allowing that to be done.

The legislation under which this proceeding was instituted and conducted fixes no limit of time in which the petition for a referendum must be filed nor does it state or indicate when the signers of a petition shall be allowed to withdraw their names therefrom, and we have been cited to no Virginia decision determinative of the question.

In jurisdictions in which the question has been presented, the decisions are conflicting. Some adhere to a liberal margin of time for withdrawal of names from the petition, and some to a narrow and strict rule of procedure. A determination of when to allow or deny the right to withdraw is influenced by the character of the proceeding and the provisions of the statute under which it is instituted and conducted.

In *Joseph Sim, et al.* v. *John K. Rosholt*, 16 N. D. 77, 112 N. W. 50, 11 L.R.A., N.S. 372, the court was called upon to determine the right of signers to withdraw from a petition filed with the county board of drain commissioners asking that the board establish a drain. Prior to final action of the board ordering construction of the drain, enough signers of the petition asked to withdraw their names from the petition to reduce the number below that necessary to confer power upon the board to order construction of the drain. It was contended by those who sought to withdraw that they had the legal right to do so at any time "prior to July 7, 1905, the date of the final order establishing the drain." In the course of the opinion denying withdrawal, the court said:

"We are clear that, after the board passed upon the sufficiency of the petition and ordered the same received and filed, and, after it had proceeded to act thereunder, its jurisdiction to take all subsequent steps necessary to the establishment of a drain thereby attached, and it could not thereafter be ousted of such jurisdiction by the action of any of the petitioners in attempting to withdraw their names from such petition. * * *" (At page 80)

In the note to this case in 11 L.R.A., N.S. at page 373, it is said:

"There is, however, considerable variation among the decisions as to the particular stage of the proceedings at which this right to withdraw may be exercised. The question is, of course, largely influenced by the nature of the proceeding and the terms of the statute under which it is instituted."

Instructive annotations and decisions on the time or stage of the proceeding at which signers of a petition of this character may withdraw as a matter of right or be permitted to withdraw in the discretion of the court after filing of the petition, before and after determination of the sufficiency of the instrument, or before final action thereon are found in 126 A.L.R. 1031 and 27 A.L.R. 2d 604. The numerous cases cited and quoted from in these annotations disclose that there is much diversity of opinion upon the question.

Exemplifying the decisions holding that, in the absence of statutory provision on the subject, signers of a petition or remonstrance may withdraw their signatures before final action, order or submission thereon, even though the result render the instrument insufficient for want of the necessary signers required by law is *Idol* v. *Hanes*, 219 N. C. 723, 14 S. E. 2d 801. There, at page 725, it is said:

"It is supposed that second thoughts are apt to be sounder, and

this conviction has led courts to consider the right of withdrawal favorably, both as a matter of justice to the individual, who is entitled to apply his best judgment to the matter in hand, and as sound policy in community and public affairs, where the establishment of governmental institutions should rest upon mature consideration rather than be mere unnecessary excrescences upon the body politic, raised by the whim and fancy of a few men."

Typical of the decisions holding that the right to withdraw is lost when the petition is completed and filed before the body or court empowered to act thereon is *Uhl* v. *Collins*, 217 Cal. 1, 17 P. 2d 99, 85 A.L.R. 1370. In refusing signers the right to withdraw from an initiative petition, the court there said:

"* * * In order to accomplish anything, the proponents of a measure must be able to rely upon signatures obtained, and if continually forced to seek new ones to take the place of withdrawals, may never be able to prepare a proper petition within the limited period which usually exists. To permit withdrawals after the petition is completed and filed, and the work of securing signatures abandoned, seems to us to make the system wholly unworkable. We do not believe that this mere implied power of the signer, which is not expressly provided for in our Constitution or statutes, can be used so as to jeopardize the exercise of the constitutional right itself. * * *" (At page 4.)

Decisions from other jurisdictions of substantially similar effect are found in 27 A.L.R. 2d 608.

We are not here confronted with applications to withdraw presented after the mere filing of the initial petition. Other action had been taken and additional circumstances of moment were involved when appellees sought to withdraw their signatures. Jurisdiction of the court had attached when the order of July 9, 1959, was entered and the special commissioners thereby appointed had undertaken the performance of their duties. In fact, considerable labor and expense had been incurred and much of the work deemed necessary by the court for its determination of the cause had been performed. Under these circumstances, the withdrawal of appellees' signatures should have been denied, and the referendum ordered by the court.

The record shows that the commissioners were diligent and painstaking in the performance of their duties. Though the language used in the report that "to the best of their information and belief" 895 qualified registered voters signed the petition and "to the best of their information and belief" there were 8,182 qualified registered

voters in the county was not as definite and certain as might be desired, yet the court was justified in accepting and acting upon the commissioners' tabulations of qualified voters as stated and returned. We do not mean to indicate that the appointment of special commissioners is necessary or even at times advisable in proceedings of this nature. The duties that the commissioners performed may properly and ordinarily be performed by the county officials or by hearing testimony in open court. However, in this instance the court considered it advisable to appoint commissioners to ascertain the facts deemed necessary, and their appointment was acquiesced in by all the signers of the petition. It is conceded by the litigants that had the referendum been ordered, the fee and expenses of the commissioners would have been properly chargeable as costs incident to the referendum and payable by the county as part of the costs of the election. With this we agree, and as we have determined that the order of the trial court must be reversed and the referendum ordered, there is no just reason why the fee and expenses of the commissioners should not be paid by the county as costs of the election. We direct that an order be entered to that effect by the circuit court.

For the reasons stated the judgment order appealed from will be reversed and the cause remanded with directions that the circuit court order that a referendum be held as provided for in section 15-267 on the question of adopting the county executive form of government.

Appellants, Arthur Gonzales and others, having prevailed in this court, the costs of this appeal will be assessed against Robert G. Wyatt and the other appellees.

*Reversed and remanded.*